UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In Re: ) | Case Number: 14-42855-399 |
| ) | |
| N.W. HOLDING CO., NU-WAY FUEL ) | Jointly Administered |
| DISTRIBUTORS CO., NU-WAY ) | Chapter 11 |
| REPAIR CO., NU-WAY SERVICE ) | |
| STATION, INC., RENT-ME TRAILER ) | |
| LEASING, INC., AND COSTELLO ) | |
| TERMINAL NO. 4, L.L.C. ) | |
| ) | |
| Debtors. ) | |

**MEMORANDUM OPINION**

The matter before me concerns two motions, each entitled *Motion to Reject Collective Bargaining Agreements and to Terminate Retiree Benefits Pursuant to 11 U.S.C. § 1113, 1114 of the Bankruptcy Code,* filed by the Debtors. The motions seek to reject collective bargaining agreements with the Automotive, Petroleum and Allied Industries Employees Union, Local No. 618 (Teamsters), a local affiliate with the International Brotherhood of Teamsters, and District No. 9, International Association of Machinists and Aerospace Workers (Machinists) (together Unions). Although the motions reference the possible rejection of retiree benefits as well, counsel for the Debtors, Teamsters, and Machinists agreed that the Debtors do not seek relief regarding retiree benefits under §1114. Jurisdiction is proper under 28 U.S.C. §§ 151, 157, 1334, and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri. For the reasons stated below, I grant the Debtors' motions.

**BACKGROUND AND FACTS**

**A.     The Collective Bargaining Agreements**

The Debtors are a family-operated lessor of trucks and trailers located in St. Louis, Missouri. They also distribute fuel and perform truck and trailer repair. The Debtors filed

1

petitions for relief under Chapter 11 of the Bankruptcy Code and the Debtors' cases have been jointly administered.

Nu-Way Service Station, Inc. (Service) is a party to two collective bargaining agreements (CBAs)—an agreement with the Teamsters and another with the Machinists. The term of the Machinist's CBA was July 1, 2011 to June 30, 2014. Service and the Machinists still abide by its terms as they remain in effect post-expiration under the National Labor Relations Act. The Teamster's CBA will not expire until September 30, 2016.

Each CBA requires Service to make monthly payments based on the number of employees currently covered under the agreements. All of the Debtors' employees are employed by Service. Service employs a total of thirteen individuals—down from eighteen at the time of its bankruptcy petition. Five employees are Teamsters and two are Machinists. The Machinist's CBA requires payments in the amount of $365.50 to be made to Machinists' pension fund and $1,357.00 to the Machinists' Health and Welfare Fund. The Teamsters' CBA requires payments in the amount of $1,077.60 to the Central States, Southeast and Southwest Areas Pension Fund (Central States) and $1,100.00 to the Health and Welfare Plan. In total, given the number of Teamsters and Machinists that Service currently employs, Service is required to make monthly payments of $3,444 under the Machinist's CBA and $10,888 under the Teamster's CBA.

The CBAs contain several other relevant provisions. First, each CBA guarantees every employee a forty hour work week even if the Debtors' workflow would otherwise require less. Second, the Machinist's CBA places restrictions on the number of less experienced employees the Debtors may hire. For example, only one apprentice may be hired per five journeymen. In addition, the Debtors are required to increase new hires' rate of pay based on a fixed timetable. Finally, each CBA contains a procedure for handling grievances relating to harassment, unfair treatment, and discrimination.

2

On November 19, 2013, nearly five months before the Debtors filed their petition, Central States obtained a judgment against Service in the amount of $351,194.07 relating to a shortfall in contributions. This amount was determined by an audit conducted by Central States. Central States was given access to the Debtors' books and records to include payroll information and hourly employee records. The results of this audit were available to both the Teamsters and the Machinists when the Debtors filed their petitions.

**B.    The Debtors' Attempts to Modify the Collective Bargaining Agreements**

On November 13, 2014, the Debtors filed motions to reject the CBAs with the Teamsters and the Machinists. The Teamsters filed an objection on November 20, 2014 and the Machinists did the same on May 12, 2015.

Negotiations to modify the CBAs had already been underway for months before the Debtors filed their motions to reject. On June 24, 2014, the Machinists and the Debtors met in person to discuss modification. They met again on July 7, 2015, and the Debtors provided the Machinists with a written proposal for modification. Rather than create an entirely new agreement, the written proposal simply revised portions of the expired CBA. The Debtors and the Machinists met again on July 30th, August 25th, and November 17th. The August 25th meeting was led by a Federal Mediation and Conciliation Services mediator. On September 18, 2014, the Debtors provided the Machinists with classification and pay rates for the Debtors' Machinist employees at the Machinists' request. Finally, on January 8, 2015, the parties met for the final time, and the Machinists provided the Debtors with a counterproposal. The negotiations never proved fruitful.

The Debtors' final proposal suggested eliminating the obligations to contribute to the Machinists' pension fund, guarantee all employees a 40 hour work week, and honor the apprenticeship program for new workers. The proposal replaces the pension fund contribution requirement with a § 401(k) retirement plan. It also swaps the Health and Welfare Fund contribution requirement with employer-provided, private health insurance

3

for all union and non-union employees. The proposal also includes changes to the grievance procedure which were intended to create a less costly, more streamlined process.

The Debtors' negotiations with the Teamsters were also unsuccessful. On August 1, 2014, the Debtors provided the Teamsters with their modification proposal in the form of a revised version of the existing CBA. On January 22, 2015, employees of the Debtors and representatives of the Teamsters met in person. On January 27, 2015, four days after the Debtors had delivered its Last, Best, and Final Offer, the Teamsters informed the Debtors that they had not been provided all relevant information. Nevertheless, the Teamsters took the Debtors' Last, Best, and Final Offer to a vote. The terms of the Last, Best, and Final offer were similar to the final offer that the Debtors had provided to the Machinists. The Debtors' modification proposal did not receive the requisite unanimous approval; there was one dissenter among the six votes cast.

## DISCUSSION

**1.      Bankruptcy Code § 1113 Applies to the Collective Bargaining Agreements**

A collective bargaining agreement may be rejected in Chapter 11 if the requirements set forth in § 1113 of the Bankruptcy Code are satisfied. Rejection of a collective bargaining agreement is a core matter. 28 U.S.C. § 157(b)(2)(A).

There is no question that § 1113 may be used by the Debtors in this case to reject the Teamsters collective bargaining agreement if the requirements are met. However, the Machinists argue that § 1113 may not be used to reject their collective bargaining agreement because the agreement expired by its own terms on June 30, 2014. Therefore, as a threshold matter, I must determine whether § 1113 applies to the CBA with the Machinists. I hold that it does.

4

Section 1113 still has application to a collective bargaining agreement where the parties continue to abide by its obligations. *In re Trump Entertainment Resorts, Inc.*, 519 B.R. 76 (2014)*; In re 710 Long Ridge Road Operating Company, II, LLC*, 518 B.R. 810 (2014). I, like the court in *Trump*, am persuaded that "Congress selected the phrase 'continues in effect' in Section 1113(e) with the intention of giving debtors the authority to modify the continuing effects of an expired collective bargaining agreement." *Trump*, 519 B.R. at 85. Consequently, I must respectfully disagree with the *In re Hostess Brands, Inc.* court which held that the "continues in effect" language only appears in subsection (e) of the statute so as to provide a narrow exception to the otherwise general, albeit implied, prohibition against rejection of expired collective bargaining agreements. 477 B.R. 378, 382-83 (Bankr. S.D.N.Y. 2012). The phrase "continues in effect" is a "term of art regularly used in labor law to refer to the employer's post-expiration *status quo* obligations" to continue abiding by the obligations of the expired collective bargaining agreement until such time as the National Labor Relations Board (NLRB) rules that parties have bargained to an "impasse." *Trump*, 519 B.R. at 84 (citing *In re Karykeion*, 435 B.R. 663 (Bankr. C.D. Cal. 2010)).

I am, however, inclined to agree with Judge Drain's "intuition" in *Hostess* that "the bargain to impasse process outside of the 1113 process, under the NLRA, could well be more lengthy or create more risk of uncertainty..." than would allowing Debtors to apply § 1113 to the expired agreement. *Hostess*, 477 B.R. at 381. To the extent that Congress created a separate, expedited process for addressing collective bargaining agreements when it enacted § 1113, I believe it would undermine the purpose of the statute to disallow its use in favor of NLRB proceedings which may slow or destroy the Debtors' ability to reorganize.

Indeed, to bar § 1113's application to the expired collective bargaining agreement would be a victory for form over substance. "[T]he terms of the expired CBA continue to impose the exact burden on the Debtors' restructuring efforts that section 1113 is meant to relieve." *Trump*, 519 B.R. at 86. Therefore, I hold that § 1113 applies to the Debtors'

5

collective bargaining agreements with the Teamsters as well as the Machinists, and both may be rejected if the statutory requirements are met.

**B.     Rejection is Justified Under § 1113**

Having established that § 1113 applies to each CBA in this case, I turn to the nine requirements for rejection under § 1113. The Debtors must show, by a preponderance of the evidence, that:

(1) the Debtors made a proposal to the union to modify the CBA;

(2) the proposal was based on the most complete and reliable information available at the time of the proposal;

(3) the proposed modifications are necessary to permit reorganization;

(4) the modifications treat creditors, the Debtors, and all other affected parties fairly and equitably;

(5) the Debtors provided the union with such relevant information as is necessary to evaluate the proposal;

(6) the Debtors met with the union at reasonable times;

(7) the Debtors conferred in good faith in an attempt to reach a mutually satisfactory agreement;

(8) the Unions refused to accept the proposal without good cause; and

(9) the balance of the equities favors rejection. *In re Patriot Coal Corp.*, 493 B.R. 65, 112 (Bankr. E.D. Mo. 2013).

"[O]nce the debtors have made their prima facie case, the burden shifts to the union to show that the debtor did not supply sufficient information, that the debtor did not bargain in good faith in addition to demonstrating that the union had good cause to refuse the proposal." *Id.* The Debtors have met their burden.

a.     *Information Sharing: Requirements 1, 2, and 5*

Section 1113(b)(1) imposes upon the Debtors the burden of not only providing the Teamsters and the Machinists with a proposal that is based on the most complete and reliable information available at the time of the proposal, but also the information necessary to evaluate it. All parties agree that the Debtors submitted proposed modifications to the Teamsters and the Machinists. Therefore, § 1113(b)(1)(A)'s requirement that the Debtors "make a proposal to the authorized representative of the employees covered by such agreement" is satisfied.

The Debtors have also satisfied § 1113(b)(1)(A)'s requirement that the proposal be based on the most complete and reliable information available. "The requirement contemplates the debtor will provide comprehensive information and make an honest effort to compile all relevant data. It need not be a perfect compilation but a good faith, best efforts one." *Trump*, 519 B.R. at 89. Such is the case here. Several witnesses with intimate knowledge of the Debtors' business and its CBAs testified that the proposals are based on expected cost savings related to the elimination of required contributions to the pension funds and corresponding audits, the 40 hour work week guarantees, existing grievance procedures, and the rules relating to the hiring of lesser experienced employees. These cost savings, they argue, will permit the Debtors to increase sales by hiring more employees and purchasing more trailers for lease.

Based on the evidence presented, I am confident that the elimination of these provisions from the CBAs will result in real cost savings to the Debtors. I am similarly confident that the payroll information and hourly records necessary to produce accurate projections were in the Debtors' possession when it formulated the proposed changes. Indeed, many of these records were provided to Central States when it performed its prepetition audit. Furthermore, although a foundation in "hopeful wishes, mere possibilities and speculation" does not satisfy the most complete and reliable information requirement,

7

many of these proposed cost savings are unquantifiable. This makes the task of creating numeric projections based on complete and reliable information rather difficult. Nevertheless, "[s]ection 1113 only mandates the production of data that exists, and generally, a debtor is not required to perform further analyses nor is it required to create financial data that it otherwise does not need. A debtor can only be required to provide information that is within the debtor's power to provide." *Patriot Coal*, 493 B.R. at 115. Consequently, I conclude that the Debtors have satisfied the complete and reliable requirement of § 1113 and, in fact, the Teamsters and the Machinists have not provided evidence that they required additional information to assess the Debtors' proposals.

Moreover, § 1113(b)(1)(B) requires the Debtor to have provided the Teamsters and the Machinists "with such relevant information as is necessary to evaluate the proposal." While no financial information was provided to the Teamsters or Machinists in documentary form during the course of their negotiations, I do not think that this is fatal to the Debtors' case. The results of the audit conducted by Central States were available to both the Teamsters and the Machinists during this time. In fact, it was available beginning in November 2013—more than six months before negotiations began. "The Code does not specify that the required information be provided to [sic] union contemporaneously with the proposal to modify the provisions of the collective bargaining agreement … Information provided *prior to* the filing of the bankruptcy petition may be considered in determining whether requirement (5) has been satisfied." *George Cindrich Gen. Contracting, Inc. v. Independent Building Material and Construction Drivers, Helpers and Material Handlers, Teamsters Local No. 341 (In re George Cindrich Gen. Contracting, Inc.)*, 130 B.R. 20, 24 (Bankr. W.D. Pa. 1991) (citing *In re Wheeling–Pittsburgh Steel Corp.,* 50 B.R. 969, 981 (Bankr.W.D.Pa.1985), *reversed on other grounds, Wheeling–Pittsburgh Steel Corp. v. United Steel Workers of America,* 791 F.2d 1074 (3rd Cir.1986)).

Based on the testimony at trial, I am inclined to believe that information regarding the adverse financial impact of the CBAs must have been verbally conveyed to the unions during negotiations. First, it is unlikely that the Debtors and the unions would have combed

8

through the Debtors' proposal without discussing the CBAs' burden on the Debtors' business. Second, it is equally improbable that the Teamsters would have submitted the proposal to their membership for a vote without first having a clear understanding of the proposal's economic bases. Third, it is inconceivable that all but one voting member would vote in favor of the proposal absent such an understanding. As for the Machinists, the federal mediator that oversaw many of the Debtors' negotiations with the Machinists would likely have demanded that the Debtors provide the proposal's economic basis.

Admittedly, however, this may be less than that which is "firmly grounded in the historical reality of operational economics, an unvarnished evaluation of [the debtor's] current straits, and a thorough analysis of all of the incidents of income and expense that would bear on its ability to maintain a going concern in the future." Still, I do not think that this case requires as much. *Patriot Coal*, 493 B.R. at 114. "[T]he breadth and depth of the requisite information will vary with the circumstances, including the size and complicacy of the debtor's business and work force; the complexity of the wage and benefit structure under the collective bargaining agreement; and the extent and severity of modifications that the debtor is proposing." *In re AMR Corp.*, 477 B.R. 384, 439 (Bankr. S.D.N.Y. 2012) (citing *In re Mesaba Aviation, Inc., 341 B.R. 693, 714 (Bankr. D. Minn. 2006)).* The Debtors are collectively a small, family-run business. They employ only two Machinists and five Teamsters. This is not a case in which the Debtors are "engaged in a large, complex, and interrelated industry governed in all directions by contract, regulation, and collective bargaining agreement … [in which] far more information is called for to satisfy the fifth requirement." *Mesaba*, 341 B.R. 693 at 714.

In any event, the Debtors provided the unions with enough information to shift the burden to the unions "to provide evidence that the information provided was not the relevant information which was necessary for them to evaluate the proposals.'" *Id.* at 713. The Teamsters and Machinists did not do so. If the Debtors' disclosures were inadequate, the unions could have requested more. *In re Chicago Const. Specialties*, Inc., 510 B.R. 205, 220 (Bankr. N.D. Ill. 2014) (explaining that "[h]ad the Respondents wanted additional

9

information, they could have requested it. Instead, the Respondents chose not to engage with the Debtor"). Again, § 1113 does not require that all of the necessary information be provided with the proposal itself. *Id.* The Debtors' discussion of the adverse terms of the CBAs during negotiations triggered the Unions' burden to request additional information if necessary. Nothing in the record or the exhibits indicates that the Debtors refused to make additional information available. For instance, the Debtors provided the Machinists with classification and pay rates when it was requested. The results of the Central States audit were always available.

I decline to hold that the Teamsters and the Machinists met their burden by demonstrating a mere absence of disclosure. The Unions must affirmatively indicate why the information provided was insufficient to allow them to evaluate the proposal. A union in receipt of supposedly less than adequate disclosure may not remain silent as to the deficiency in order to later use the deficiency as a litigation tactic. This would undermine § 1113's efforts to facilitate the negotiation process between Debtors and union representatives. *See, e.g.*, *In re Royal Composing Room, Inc.*, 62 B.R. 403, 405 (Bankr. S.D.N.Y. 1986) (discussing the importance of negotiation in the statute's legislative purpose). Therefore, I conclude that "[b]y failing to engage the Debtor and failing to advance a theory under which the Debtor's disclosures are inadequate," the Teamsters and the Machinists have failed to show that the results of Central States audit and the verbal information the Debtors provided during negotiations fell short of § 1113's relevant and necessary requirement. *Id.*

  b.  *Good Faith Negotiations: Requirements 6, 7, and 8*

Section 1113(b)(2) requires the Debtors to have met with the Teamsters and Machinists at reasonable times in a good faith attempt to reach a mutually satisfactory outcome. Rejection also requires that the Unions refuse to accept the Debtors' proposal without good cause. 11 U.S.C. § 1113(c)(2). "Once the debtor shows it has complied, the

10

union must produce evidence that the debtor did not confer in good faith." *Trump*, 519 B.R. at 91. The Teamsters and the Machinists have failed to produce such evidence.

There is little question that the Debtors met with the Unions at reasonable times. They met with the Teamsters on January 22, 2015, and made attempts to hold meetings before then. In fact, it was the Debtors that initially reached out to the Teamsters to set a time and date for meeting. The Debtors met with the Machinists on six occasions. Such frequency is more than reasonable given the relative size of this case.

The Teamsters and the Machinists, however, argue that the Debtors' efforts were not in good faith. They argue that the Debtors never intended to reach a mutually satisfactory outcome as indicated by their supposed refusal to share information. I disagree. Again, the results of the Central States audit were available to the Teamsters and the Machinists. In addition, the Debtors went through each proposed modification with the unions in person. They undoubtedly discussed the adverse financial effect that the CBAs were having on the Debtors' business in their present form.

The Debtors have shown themselves to be far from stubborn. First, they offered to purchase health insurance for all employees. Second, rather than eliminating any provision for pension or retirement funds, the Debtors volunteered to provide the Teamsters, Machinists, and every non-union employee with a 401(k) plan. Third, the Debtors have exhausted their cost-cutting opportunities. For example, they have dropped their labor force from 18 employees in April 2014 to 13 currently—a reduction of 28%. They have also sold real property and eliminated unnecessary luxuries like company vehicles. Overall, I see good faith on behalf of the Debtors.

The Unions, on the other hand, have not been so willing to compromise. They have not indicated that they were willing to make concessions during negotiations. In fact, the Teamsters did not even provide a counterproposal. The Teamsters and Machinists have argued tirelessly that the Debtors' proposed modifications are unwarranted, but they have

not provided any specific deficiencies. They have instead contended that the Debtors have failed to substantiate the proposed modifications with enough evidence. Aside from its inaccuracy, this argument indicates that the Unions fundamentally misunderstand their burden. "If the union believes that a vital part of the proposal is unacceptable, it should enter into good faith negotiations aimed at moderating that element, or at substituting a measure less offensive to the union but achieving comparable savings for the debtor." *Royal Composing Room*, 848 F.2d at 349. This is not what the evidence bears out. Negotiation is a two way street; if the unions wish to show that they rejected the proposals with good cause, they must show that they were willing to leave something on the bargaining table as well. They have not done so. Under these circumstances, therefore, I cannot conclude that the Unions rejected the Debtors' proposals for good cause or that the Debtors failed to exercise good faith.

### c.  *The Substance of the Proposals: Requirements 3 and 4*

The proposed modifications must also be necessary to permit the reorganization of the Debtors. 11 U.S.C. § 1113(b)(1)(A). Although circuits have defined "necessary" slightly differently, I adopt the Second Circuit's definition that Judge Surratt-States applied in *Patriot Coal.* A modification must be "essential or necessary to prevent liquidation and ultimately for the debtor to successfully reorganize and emerge from bankruptcy as a viable company. *Patriot Coal*, 493 B.R. at 124-25. This standard "encompasses the ultimate success of reorganization rather than merely the avoidance of immediate liquidation." *Id.* at 125 (quoting *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Gatke Corp.*, 151 B.R. 211, 213 (N.D. Ind. 1991)). The necessity of a proposal is determined by assessing the proposal as a whole rather than the necessity of each of its components. *Id.* I also think it is appropriate in this case to weigh the effect that the proposed modifications will have on the ability of all of the Debtors to reorganize even though Service is the only party to the CBAs. *See, e.g., Patriot*, 493 B.R. 65, *Nw. Airlines Corp.*, 346 B.R. 307 (considering all Debtor affiliates in its analysis). Taken together, I

believe that the Debtors' proposed modifications are necessary for it to reorganize and compete in the future.

The consolidated budget that the Debtors introduced into evidence provides evidence of cost savings. The introduction of a 401(k) plan in lieu of the union pension plans would provide $64,000 in annual savings.[1] Eliminating the Health and Welfare fund contribution requirement in favor of private health insurance would save $7,660 annually.[2] This produces combined savings of $71,660 per year. In addition, it is worth noting that these savings represent the bare minimum. Once the Debtors are able to hire more employees—which they must do if they hope to remain a viable company—the relative savings will increase. For this reason, we must dismiss the Machinists' argument which states that the proposed modifications are unnecessary because the cost savings of the proposals are de minimis. The cost savings will increase as the Debtors grow.

I also believe that revisions to the apprenticeship program and 40 hour work week guarantee have real value as well. Although the associated savings are essentially unquantifiable at this point, "[n]on-economic modifications that have a significant economic impact on the debtor's financial operations can be necessary to the debtor's reorganization." *Id.* (quoting *In re Nw. Airlines Corp.*, 346 B.R. 307, 322 (Bankr. S.D.N.Y. 2006)). In this case, I believe these modifications will more closely align the Debtors' labor costs with that of its competitors as it hires new employees in the future. "[A] debtor's long-term ability to compete in the marketplace for its product is essential for the viability of any

---

[1] Exhibits S and JJ indicate that the Debtors are currently contributing $85,000 annually to the pension fund. The 401(k) plan would require an outlay of only $21,000 per year. This yields yearly savings of $64,000. The $21,000 outlay is derived by subtracting the projected total cost of 401(k) expenditures for all employees, $43,950, from the Debtors' current 401(k) expenditures for non-union employees, $22,950.

[2] Exhibits S and JJ indicate that the Debtors are currently contributing $100,000 annually to the Health and Welfare fund. Private health insurance would require an outlay of only $92,340 per year. This yields yearly savings of $7,660. The $92,340 outlay is derived by subtracting the projected total cost of private health insurance for all employees, $140,340, from the Debtors' current health insurance expenditures for non-union employees, $48,000.

reorganization … [and] rejection [may be necessary] when a debtor's labor costs are higher than those of its competitors and where the debtor faces 'enormous competitive pressure." *Id.* (quoting *AMR Corp.*, 477 B.R. at 407). The testimony at trial revealed that most of the Debtors' competitors utilize non-union labor. This provides the Debtors' competitors with a competitive advantage as non-union labor is cheaper. If, for instance, the Debtors' competitors pass this savings on to their customers in the form of lower prices, the Debtors may find themselves with lost market share and lost profitability. Thus, given the competitive landscape, I believe these modifications are necessary to the Debtors' reorganization and overall viability.

Indeed, Debtors have little else left to cut. *Id.* They have reduced the size of their labor force, sold real property, and eliminated unnecessary items. They also purchase fuel on the spot market so as to eliminate holding costs.[3] Consequently, I have little trouble in concluding that the proposals are necessary to the Debtors' reorganization.

I also do not believe that the proposed modifications can be fairly said to "treat creditors, the debtor and all of the affected parties" less than fairly and equitably. 11 U.S.C. §1113(b)(1)(A). The Debtors have offered to purchase health insurance and provide a 401(k) retirement plan for all employees. The cost savings will also likely leave more funds available for creditors under the plan.

### d. *The Balance of the Equities: Requirement 9*

Finally, rejection requires that "the balance of the equities clearly favors rejection." 11 U.S.C. § 1113(c)(3). Relevant factors in making this determination include: "(1) the likelihood and consequences of liquidation if rejection is not permitted; (2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force; (3)

---

[3] This likely leads to greater volatility in pricing and costs from a long-term perspective. However, it probably leaves the Debtors with greater cash on hand at any given time with which to pay reoccurring expenses.

14

the likelihood and consequences of a strike if the bargaining agreement is voided; (4) the possibility and likely effect of any employees claims for breach of contract if rejection is approved; (5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and (6) the good or bad faith of the parties in dealing with the debtors' financial dilemma." *Trump*, 519 B.R. at 91 (citing *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 93 (2d Cir.1987)).

"The balance of the equities nearly always will tip in favor of the party that seeks to reach a compromise and to that end negotiates in good faith." *Royal Composing Room*, 848 F.2d at 349. Such is the case here. The Debtors initially took numerous cost-cutting measures before attempting to modify the CBAs. When that did not appear to be enough, the Debtors proposed modifying the CBAs in an attempt to become more competitive with other industry participants enjoying lower labor cost structures. Rather than propose eliminating retirement funding or health benefits from the CBAs entirely, the Debtors merely proposed more cost-effective alternatives to the CBAs' existing structures. Far from management over-reaching, these modifications merely bring union employees' benefits in line with non-union employees.

The Debtors also met with the Teamsters and the Machinists in a good faith attempt to negotiate mutually beneficial, modified agreements. The Debtors stood ready to provide the unions with any information that may have been requested or that was not already available in the audit conducted by Central States. I see no evidence of a possible labor strike or the reduction in value of creditors' claims. On the contrary, it seems likely that more value will be available for creditors given the cost savings that will flow from the proposed modifications. If, on the other, the proposals are not rejected, liquidation is not far-fetched. The Debtors have little else to cut, and little ability to generate greater revenue without hiring new employees. However, they cannot do so without reducing their labor costs thru rejection of the CBAs. I hold, therefore, that rejection of the CBAs is proper because the Debtors have met all nine requirements for doing so.

## CONCLUSION

For the reasons stated, each *Motion to Reject Collective Bargaining Agreements and to Terminate Retiree Benefits Pursuant to 11 U.S.C. § 1113, 1114 of the* Bankruptcy *Code* will be granted in that the CBAs are rejected under 11 U.S.C. § 1113.

DATED:  July 1, 2015

St. Louis, Missouri
uvb

_____
Barry S. Schermer
United States Bankruptcy Judge

Copies to:

All creditors and parties in interest as listed on the mailing matrix in case numbers:

14-42855-399, 14-42856-399, 14-42857-399, 14-42859-399, 14-42860-399, 14-42861-399